Argued September 28, affirmed October 12, 1920.

## ADAMS v. ALBINA ENGINE WORKS.*

(192 Pac. 793.)

**Master and Servant—Reasonable Care to Furnish Safe Place Required.**

1. It is the legal duty of an employer to exercise reasonable care to furnish its employee with a reasonably safe place in which to work.

**Master and Servant—Negligence in Failure to Furnish Safe Place Held Question for Jury.**

2. In an action by a laborer in a material-yard, for injuries sustained in getting out angle-irons for ships, case *held* for the jury on evidence that defendant employer failed to exercise reasonable care to furnish plaintiff with a reasonably safe place in which to work.

**Master and Servant—Evidence Held not to Show Work was to Render Place Safe.**

3. In a laborer's action for injuries sustained while getting out angle-irons from a pile in his employer's material-yard, evidence *held* not to show that the work in which he was engaged was to make the place safe, so as to make the rule as to safe place to work inapplicable.

**Trial—Instruction Held not Erroneous in View of Remainder of Charge.**

4. In a laborer's action for injuries sustained while assisting in getting out ship angle-irons from a pile in his employer's material-yard,

*On the question of different forms of statement of the general rule with respect to master's duty as to places and appliances furnished to servant, see note in 6 L. R. A. (N. S.) 602.

On duty of master to warn and instruct servant as to the perils of the employment, see note in 44 L. R. A. 33.

On applicability of rule *res ipsa loquitur* as between master and servant, see notes in 6 L. R. A. (N. S.) 337; 10 L. R. A. (N. S.) 214, and L. R. A. 1917E, 4.                                REPORTER.

instruction *held* not erroneous, in view of other parts of charge as virtually informing the jury that the doctrine of *res ipsa loquitur* applied.

From Multnomah: WILLIAM N. GATENS, Judge.

Department 2.

Plaintiff brought this action for damages for personal injuries. The cause was tried to the court and jury, and a verdict in the sum of $7,000 was rendered in favor of plaintiff. From a judgment thereon, defendant appeals.

Plaintiff was employed by the defendant company as a laborer in a material-yard. He was a steam-fitter by trade. On the morning of October 25, 1917, the third day of his employment, he was directed by the foreman of the yard to assist two other men in getting out some angle-irons from a pile that had been unloaded from a car the day before. While plaintiff was thus engaged the pile of angle-irons tipped over on to him, causing a severe injury. These angle-irons were approximately 40 feet in length and weighed 9.8 pounds to the foot, or about 392 pounds each. They were V-shaped and used as ribs in the steel boats then being constructed by defendant. They were unloaded from the railroad car by means of a derrick, the irons coming loose on the car. The derrick would lift 12 or 15, and sometimes as many as 30, angle-irons from the car and dump them promiscuously, or as one witness stated, "in every conceivable shape" on the material-yard of defendant. Afterward they would be sorted as to length, and repiled.

Plaintiff alleges as the gist of the negligence as follows:

"That the work plaintiff was performing was hazardous and involving a risk and danger to plaintiff, and plaintiff alleges that defendant was then and

there careless and negligent in the following particulars, to wit:

"(a) That said defendant carelessly and negligently directed and placed plaintiff to work at and about a pile of angle-irons, which said defendant had carelessly and negligently piled in a loose, insecure, and uneven manner, and said angle-irons were not bound together, or in such a way that, when one or two of said angle-irons were moved, the pile was apt to and did fall.

"(b) That said defendant carelessly and negligently failed to warn and advise plaintiff of the condition of said pile."

According to plaintiff's version of the matter, at the time of the accident, by the direction of the foreman, he was assisting two other men in getting out these angle-irons from the pile to be used, as the foreman informed him, "for the markers." Plaintiff testified in part as follows:

"Q. Tell the jury the circumstance of your getting injured.

"A. That morning we were assorting this angle-iron, and putting them in their respective sizes from different piles that were unloaded out of the car. We just got quite a number scattered on the stringers—got them in the clear, so we were able to work without injury to ourselves, so we would have a little space, and the foreman came along and hollered at me, says, 'Frank, come here.' I followed him, didn't stop him, going toward the south end of the yard. He says, 'We have got some angles to get out here.' I says, 'All right.' He says, 'Get hold of this tape and run over this pile; see what we can get out for the markers; there is three of them; we want to get those out as soon as we can, so not to delay the men in the machine-shop.' I answered, 'All right.' He sized up several piles, glanced at them as he went along, and he came to this particular pile, and he says, 'run down this pile.' That was a pile

about two feet high, adjacent to this pile he wanted the angles off. We measured them; they were the exact size he wanted. He says, 'Go over there and get your partners.' We were working just north of that. He says, "Tell them to come over here, and on your way,' he says, 'get your bar.' So I had to go over to the center of a pile to get my pony bar, what we classified it as, and I came back. The foreman stood there at the east end of this pile, and he turned around on his heel. He says, 'Get in over there and help them kick them out.' So Mr. Brown and the other fellow, one man on the east end and another man on the west end, so I had to go in the center, as there was no other place to go, and to be able to work there I had to stand on top of a pile just north of it, to be able to reach over to the top, and get the particular class of iron he wanted out. In doing so, we wasn't there but a few moments, we had about two angles out, when the pile turned over.

"Q. What part of the work did you do?

"A. The way the angles were, in all shapes taken out of the cars in sling-load lots, I had to take my pony bar in order to get things started, so the man on each side would get the wrench classed as a dog under the end to turn and throw it off the pile. It was my duty to get the pony bar, reach over across, get between the two angles to spring them apart far enough so the men at each end could grab that end, throw it over the dogs, and down to the place wherever the foreman directed them to throw them. I was in the act of springing this angle when the whole pile kicked up."

He stated, in effect, that the pile was about six feet high. Wooden stringers were placed under each layer. To use his language:

"They were piled on stringers, and bum stringers. All through the yard they used 12 by 12. They were all used up, and they used whatever material they could get hold of, to be able to unload this stuff out of the cars."

He stated that the evening before the accident he assisted in unloading the car by bringing material for stringers, but had no knowledge of how the angle-irons were piled.

Mr. Harrison Fisher, a witness for plaintiff, testified as follows:

"Q. [Producing a number of pieces of wood in the shape of angle-irons.] I wish you would show the jury how these angle-irons were piled up.

"A. These angle-irons came to the shipyard in carload lots. They are dumped in a car in different positions, and gotten out in sling-load lots, sometimes thirty, sometimes more, in every conceivable shape, from the car, swung around. They might tumble down like that [demonstrating]. They leave enough space between the sling-loads to get the chain out. There may be twelve, I have seen as high as thirty, at one load. They usually put them in four or five piles. They put a stringer over here. These stringers are not always this length; in case they are short, they leave them stick over here a ways, like that, and this particular piece they use for stringers is not always the same thickness; the result would be the angle-iron would touch here and here, and made a hollow down here. In this case the pile was higher than any other load I had ever seen before, reached up about six feet high, this particular pile that fell. The idea was to get the cars out of the yard, so they could get more material. At this time the yard was pretty badly congested. It was our business, after they were piled in this shape, to get them off of there, and pile them in various piles, the thirties in one pile, the forty-fives in another. After they were got up a certain distance they were bound in this shape. This is the shape the pile was in the day we left, the night before Frank got his accident [demonstrating]. * *

"Q. I understood you to say this pile was unloaded the day before Mr. Adams was hurt.

"A. Yes; we worked at it practically all day."

Mr. Ed Adams, defendant's foreman, a witness for defendant, testified, describing how the cars of angle-irons were unloaded, and stated in answer to interrogatories:

"Q. How does the crane drop these piles? Does it drop them all properly piled?

"A. Oh, no. They take it off in lots of twelve to fifteen bars to the load, lay them on blocks; then the men will assort them out, pile them in separate piles. When they come in a car, possibly sometimes three to five and six different lots of sizes and thickness, we have to assort them out and pile them up in order to check the invoice coming in. * *

"Q. When you drop them in the yard, do you drop them on any stringers? Anything of that kind?

"A. We have to put four by fours across the pile in two or three different places in order to get the chain of the crane out; otherwise the chain would bind under the load, and we couldn't get it out without throwing them all over the yard.

"Q. What is the purpose of those four by fours?

"A. The purpose of those four by fours is to hold the top load high enough off the other loads so we can get the chain out.

"Q. This pile it has been testified, where Mr. Adams was hurt, had been unloaded the day before the accident. That is about the fact, is it?

"A. Yes, sir.

"Q. How high was that pile?

"A. About three feet."

He stated, in effect, that at the time mentioned he directed plaintiff to report to Brown, who was at work at the west end of the pile of angles, where there was plenty of room for two men to work on the end of the pile; that at the time of the accident he had these men "sorting out and piling this angle-iron in lots"; and that in doing such work they work on the end of the piles, and he did not know plaintiff was working in the center of the pile. On

cross-examination this witness stated in part as follows:

"A. That is what I say; I wanted to get that pile piled over and straightened out; that is our business.

"Q. It is your business to take angle-irons and send them to different places where they want them, too, isn't it?

"A. Yes, sir.

"Q. You didn't want to do that on this occasion?

"A. I couldn't say; at the time I had an order in my hand, it might have been for some of those angles.

"Q. Isn't it a fact these men were getting out a few angle-irons, so you could send them over to the men to mark out and put in ships?

"A. I could send over, if I had an order."

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Senn, Ekwall & Recken,* with an oral argument by *Mr. F. S. Senn.*

For respondent there was a brief over the name of *Messrs. Davis & Farrell,* with an oral argument by *Mr. W. E. Farrell.*

BEAN, J.—At the close of plaintiff's case counsel for defendant moved for a judgment of nonsuit. The motion was denied. Defendant assigns this ruling as error, and submits that the evidence in the case does not disclose any negligence, or any facts from which negligence might be inferred.

The rule is stated in *Geldard* v. *Marshall,* 43 Or. 438, at page 443 (73 Pac. 330, 331):

"It is the duty of a master to exercise reasonable care to furnish his servant with a reasonably safe

place in which to work, and reasonably safe appliances and instrumentalities to work with, and to keep them in that condition.  For a failure in either of these respects he is liable to an injured servant who is himself free from negligence, unless the defects are 'known to or plainly observable by him: *Miller* v. *Inman,* 40 Or. 161, 165 (66 Pac. 713).  In an action by a servant against his master to recover damages for an injury, the burden of proof is on the plaintiff to show the negligence charged, and the mere happening of the accident is ordinarily not sufficient: *Duntley* v. *Inman,* 42 Or. 334 (70 Pac. 529). But it is not necessary that there should be positive proof of negligence.  It, like any other fact, may be inferred from the circumstances.  There may be, and are, cases in which the master's negligence is clearly inferable, although there is no positive proof thereof. The rule is that if two inferences may be legitimately drawn from the facts in evidence, one favorable and the other unfavorable to the defendant, a question is presented which calls for the opinion of the jury.  If, however, there is no proof of any fact by which the defendant's conduct may be ascertained, there is nothing for the jury.  The mere proof of an accident, therefore, ordinarily raises no presumption of negligence; but, where it is accompanied by proof of facts and circumstances from which an inference of negligence may or may not be drawn, the case cannot be determined by the court as a matter of law, but must be submitted to the jury.''

See, also, *Galvin* v. *Brown & McCabe,* 53 Or. 598, 608 (101 Pac. 671); *Rogers* v. *Portland Lumber Co.,* 54 Or. 387, 392 (102 Pac. 601, 103 Pac. 514); *Kopacin* v. *Crown-Columbia Pulp & Paper Co.,* 62 Or. 291, 296 (125 Pac. 281); *Adams* v. *Corvallis & E. R. Co.,* 78 Or. 117, 128 (152 Pac. 504).  In 1 Shearman & Redfield, Negligence (6 ed.), § 3, negligence is defined thus:

''Negligence, constituting a cause of civil action, is such an omission, by a responsible person, to use that

degree of care, diligence and skill, which it was his legal duty to use for the protection of another person from injury as, in a natural and continuous sequence, causes unintended damage to the latter.''

There is some conflict in the evidence given on behalf of plaintiff and that on behalf of defendant. This, of course, was for the jury to settle. The testimony on the part of plaintiff tended to show, and the jury might reasonably conclude therefrom, that the angle-irons mentioned were transported to the material-yard of defendant on a railroad car and were unloaded by means of a derrick in sling-load lots, of different lengths mingled together, and dumped haphazardly in piles in the material-yard; that for the purpose of being able to get the chains with which the irons were lifted, out from under them, and also for the purpose of supporting the pile, stringers were placed under each sling-load; that these stringers were usually twelve by twelve, but at the time the material in question was unloaded there were none of this size and pieces of different length and thickness were used for the purpose and were defective stringers; that the pile was six feet in height, higher than ordinarily made; that on account of the different sizes and lengths of the angle-irons and the defective and irregular stringers used in piling them, the defendant, in its haste to get the car unloaded had neglected to pile the irons in a reasonably safe or proper manner; that plaintiff in performance of his duty, in getting some of these angle-irons out of the pile for use in shipbuilding, on account of the negligent manner in which the irons were piled, was caught, as in a snare, by the pile of irons tipping over on to him, and injuring him, without his fault; that plaintiff was not repiling the irons

to make the pile safe; and that defendant failed to use reasonable care to furnish plaintiff with a reasonably safe place to work.

1, 2. Indeed, the trend of the evidence was that the piles of angle-irons, as they were unloaded from the cars, were dangerous to work around. This appears to be one of the reasons for repiling them. The question of negligence does not depend on the mere happening of the accident. It was the legal duty of the defendant to exercise reasonable care to furnish the plaintiff with a reasonably safe place in which to work: *Millen* v. *Pacific Bridge Co.,* 51 Or. 538 (95 Pac. 196); *Woods* v. *Wikstrom,* 67 Or. 581 (135 Pac. 192). There being competent evidence to be submitted to the jury, and to support the verdict, the motion for a nonsuit was properly overruled.

3. It is contended by defendant that the work in which the plaintiff was engaged at the time of the accident was for the purpose of making the place safe, and that the rule as to safe place does not apply. This contention is based upon the testimony of the defendant's foreman. It is not in accord with that on behalf of plaintiff. The jury evidently found that the plaintiff's narration of the circumstances was correct, and that the foreman had not remembered all of the details. The plaintiff had a short time before, as he says, been at work repiling another pile, but was called away by the foreman and directed to help get out some angle-irons from the pile in question for use in the construction of the boat.

The facts of the case differ from those in *Miller* v. *Hart-Parr Co.,* 165 Iowa, 181 (144 N. W. 589), cited and relied upon by defendant. There the evidence showed that the workmen were acting under general

orders to pile angle-irons separately and bind them
with strips of wood; that plaintiff, who had thus been
employed for four or five weeks, generally selected
the strips which were used, and might have used
larger and stronger ones; and that the condition and
safety of the place was continually changing as the
work progressed but contained no hidden danger.
It was held insufficient to show the defendant negli-
gent in failing to direct the use of larger and
stronger binding strips.

Here the evidence indicated that the plaintiff on
the third day of his employment was directed to work
with two others in getting out angle-irons from a
pile that had been piled or dumped from the car the
day before. He had no volition in piling the irons.
He had assisted only a short time the day before,
about thirty minutes, in gathering stringers to bind
the pile. The testimony is uncontradicted that the
kind of stringers usually used were not to be had,
and the men were obliged to use the best they could
get, those which were unequal in length and size and
defective. At the time plaintiff commenced work on
this pile the foreman directed him to ''get in over
there and help kick them out.'' He was at work
under the direct supervision of the foreman, who
was close by, and knew nothing about the manner in
which the irons had been piled.

The second assignment of error relates to the giv-
ing of the following instruction to the jury:

''While ordinarily, in a case of master and ser-
vant, such as this case is, the mere fact that the
plaintiff sustained an injury is not sufficient in it-
self to prove the defendant was negligent, still, if the
facts and circumstances of the accident are shown,
together with all the surrounding circumstances, and
if, as a result of that evidence, the result shows the

defendant negligent, that might be sufficient to establish the negligence on behalf of the defendant, provided you are satisfied from the evidence of the accident and surrounding circumstances that the accident could not reasonably have occurred in the absence of the failure of the defendant to use ordinary care."

Defendant contends that this instruction virtually informs the jury that the doctrine of *res ipsa loquitur* applies in this case, and that the falling of the pile was sufficient to authorize the jury to return a verdict.

4. We do not think that the charge was understood thus by the jury. Taken alone, the instruction complained of is quite general. In that part of the charge immediately prior to the one quoted, after defining negligence, the jury was instructed that the plaintiff must prove the negligence of the defendant, "and it cannot be inferred from the fact that the accident happened and that the plaintiff was injured," and thereafter the court charged that the plaintiff must establish by a preponderance of evidence that the injury complained of was caused by the carelessness and negligence of the defendant; and that if they found this was an accident, and one that could not have been foreseen or avoided by the exercise of that degree of care which the law requires, or one of those accidents which might occur and no one be negligent, then the defendant was not liable, and again the court charged:

"So that, gentlemen of the jury, if you find that the defendant acted in a careless and negligent manner, in that it directed and placed plaintiff to work in and about a pile of angle-irons which the defendant had carelessly and negligently piled in a loose and uneven manner, and in such a way that when one or two of said angle-irons were moved that same was

apt to fall, and did fall, and as a direct and proximate result thereof plaintiff was injured, as complained of, without negligence on plaintiff's part, your verdict should be for the plaintiff. Otherwise, your verdict should be for the defendant.''

The instruction criticised, when taken in connection with the other part of the charge, we think plainly informed the jury that the plaintiff was required to prove, and they must find, before a verdict could be rendered for plaintiff, that defendant was negligent in piling the angle-irons in a loose and insecure manner and in directing the plaintiff to work at the pile without warning him of the condition thereof. The contention of defendant in this respect cannot be sustained.

Finding no reversible error in the record, the judgment of the lower court is affirmed.          AFFIRMED.

BURNETT, BENSON and JOHNS, JJ., concur.